Belknap
No. 83-292

# THE STATE OF NEW HAMPSHIRE

v.

# ARNOLD LAFRANCE

November 23, 1983

174

*Gregory H. Smith*, attorney general (*Brian T. Tucker*, assistant attorney general, on the brief, and *Mr. Smith* orally), for the State.

*Murphy, McLaughlin & Hemeon P.A.*, of Laconia (*Philip T. McLaughlin* on the brief and orally), for the defendant.

*Christiano, Kromphold, Green, McMahon & Heed*, of Keene (*Peter H. Heed* on the brief and orally), on behalf of the New Hampshire Association of Chiefs of Police, Inc., The New Hampshire Police Association, the Americans for Effective Law Enforcement, Inc., and The International Association of Chiefs of Police, Inc., as amici curiae.

*George E. Gordon, III*, of Suncook, by brief, as amicus curiae.

*Bell, Falk & Norton P.A.*, of Keene (*Ernest L. Bell, III*, on the brief and orally), on behalf of Ernest L. Bell, Esq., Stanley M. Brown, Esq., Donald R. Bryant, Esq., Robert L. Chiesa, Esq., Richard E. Galway, Jr., Esq., Fred W. Hall, Jr., Esq., Arnold P. Hanson, Esq., Joseph M. Kerrigan, Esq., Paul McEachern, Esq., Jack B. Middleton, Esq., Joseph A. Millimet, Esq., Arthur H. Nighswander, Esq., David L. Nixon, Esq., and N. Michael Plaut, Esq., as amici curiae.

*Richard F. Upton*, of Concord, by brief and orally, as amicus curiae.

PER CURIAM. This case presents the question which branch of government controls the actual conduct of trials in our courts. More

specifically, we must determine who controls the wearing of firearms in our courtrooms—the judiciary or the legislature.

## I. *The Factual Background*

On June 15, 1983, Laconia Chief of Police Bruce Cheney was scheduled to testify in the Belknap County Superior Court trial of *State v. Timothy S. Clifton*, S-82-0186. Relying upon RSA 490:4-a, Cheney refused to enter the courtroom without his sidearm. RSA 490:4-a provides that "[n]otwithstanding any other rule, regulation or order to the contrary, law enforcement officers *shall* be permitted to wear firearms in any courtroom in the state." RSA 490:4-a (Supp. 1979) (emphasis added). The Trial Judge (*Cann*, J.), citing the long-standing Belknap County Superior Court's local policy, prohibited Cheney from entering the courtroom with a firearm. The Belknap County Attorney decided that he had to drop the criminal charge because Cheney refused to testify without his handgun.

On July 12, 1983, the instant defendant, Arnold LaFrance, came before the Belknap County Superior Court and moved that law enforcement officials be barred from wearing firearms in the courtroom during his trial. The State objected, citing RSA 490:4-a. The trial court then transferred the following questions to this court, due to the recurring nature of the issue:

> "1. Is RSA 490:4-a constitutional under the doctrine of separation of powers, N.H. Constitution Pt. 1, Art. 37, inasmuch as that statute attempts to restrict the ability of a presiding justice to control the proceedings and regulate security in his courtroom?
>
> 2. Does a justice of the New Hampshire court system have the inherent authority to control the wearing of firearms in the courtroom in which he or she is sitting, notwithstanding a statute to the contrary?
>
> 3. Is a criminal defendant's constitutional right to a fair trial infringed upon by virtue of the presence, as witnesses testifying against him, of law enforcement officers who are permitted to appear fully armed?"

## II. *The Constitutional Background*

American history and the logic of American constitutional federalism have made certain that the rule of law does not mean the supremacy of the laws enacted by the legislature, but the supremacy of the Federal and State Constitutions. Our New Hampshire Constitution was created by the people, who are sovereign, and it, being an expression of their will, is the fundamental and supreme law of the

State. No branch of State government can lawfully perform any act which violates the State Constitution.

The people of New Hampshire adopted the constitutional principle of separation of powers in the Constitution of 1784, and this principle has governed the three branches of our State government to the present day:

> "In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity."

N.H. CONST. pt. I, art. 37.

■ With reference to the purpose of this provision of our Bill of Rights, it should be remembered that during the American Revolution, many executive and judicial powers were exercised by the legislature, and this practice resulted in great dissatisfaction. Hence, article 37 was adopted to protect the executive and judicial branches of the State government from legislative encroachment. *Attorney-General v. Morin*, 93 N.H. 40, 46, 35 A.2d 513, 516 (1943).

■■ Separation of powers prevents usurpation of controlling authority by one branch. "Each branch acts as a check on the other, protecting the sovereignty and freedom of those governed by preventing the tyranny of any one branch of the government being supreme." *Opinion of the Justices*, 110 N.H. 359, 362, 266 A.2d 823, 825–26 (1970). If the people are to remain free and retain their sovereignty, then government must be limited; the separation of powers is essential to this end.

■ The separation of powers requirement of the constitution is violated by an improper imposition upon one branch of constitutional duties belonging to another or an encroachment by one branch upon a constitutional function of another. *Opinion of the Justices*, 121 N.H. 552, 556, 431 A.2d 783, 785–86 (1981); *Opinion of the Justices*, 116 N.H. 406, 413, 360 A.2d 116, 122 (1976).

Each of the three branches of government has limited authority to exercise action on behalf of the sovereign people. Part II, article 5 of the Constitution of New Hampshire provides that the "general court" or legislature may pass all reasonable laws, subject to one powerful proviso—that *"the same be not repugnant or contrary to this constitution."* N.H. CONST. pt. II, art. 5 (emphasis added). Thus, our

voters and founding fathers intended to create a government which would be checked by a higher law. That higher law is our State Constitution. It is the constitution that all officials take an oath to uphold, and that governs all of our actions.

■ A function of the judicial branch is to adjudicate the rights of citizens who may assert that a legislative action is constitutionally void, either on its face or as applied to a particular set of facts. Although the legislature and the governor may enact laws in good faith, they may occasionally err. Under the fundamental charter of our State government, those errors and constitutional challenges usually evolve into lawsuits that come before the judiciary for resolution.

■ Any legislative act violating the constitution or infringing on its provisions must be void because the legislature, when it steps beyond its bounds, acts without authority. The judiciary, whose duty it is to expound what the law is, simply compares the legislative act with the constitution; since the constitution clearly cannot be adjudged void, the courts have no choice but to declare any act which is inconsistent with it to be of no effect. For judges to do otherwise would violate their oaths.

For example, only last year, a law passed by a majority of our popularly elected legislators and approved by the governor was challenged as being patently unconstitutional. The $250 minimum business profits tax was struck down by this court as violating part I, article 12, and part II, articles 5 and 6, of the New Hampshire Constitution. *Johnson & Porter Realty Co. v. Comm'r of Rev. Admin.*, 122 N.H. 696, 698, 448 A.2d 435, 436 (1982).

■ The courts have the duty to interpret constitutional provisions. This duty may result in decisions that run counter to the present desires of the voters or their elected representatives. This is so because the constitutions of our States and of the nation are intended to be restraining documents so that exercise of power by the majority does *not* go unchecked. We do not have unqualified majority rule; we have majority rule with protection for minority and individual rights. Without this limitation we would have a tyranny of the majority and we would lose our liberty.

■ In New Hampshire, this reasoning was carried over to part I of our constitution, which contains the Bill of Rights for all New Hampshire citizens. In addition to addressing freedom of speech, freedom of the press, and the right to a jury trial, the New Hampshire Bill of Rights specifically recognizes the need for an independent judiciary:

"It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit."

N.H. CONST. pt. I, art. 35.

Judicial review is the exercise by courts of their responsibility to determine whether acts of the other two branches are illegal and void because those acts violate the constitution. The doctrine authorizes courts to determine whether a law is constitutional, not whether it is necessary or useful. In other words, judicial review is the power to say what the constitution means and not whether such a law reflects a wise policy. Adherence to the doctrine of judicial review is essential to achieving balance in our government. Without it, legislation such as that providing for the minimum business profits tax would still be in effect. Judicial review, coupled with the specified constitutional provisions which keep the judicial branch separate and independent of the other branches of government and with those articles of the constitution that protect the impartiality of the judiciary from public and political pressure, enables the courts to ensure that the constitutional rights of each citizen will not be encroached upon by either the legislative or the executive branch of the government.

It was almost two hundred years ago that these principles and doctrines came together in a dispute over a will. Mrs. Merrill petitioned the legislature for another trial after the superior court reversed a prior probate decree that had awarded the property of a deceased man named Ward to her family. She succeeded in having a legislative act passed giving her the right to try her case a second time. Mr. Ward's heirs then appealed to the highest court in New Hampshire, then called the superior court, arguing that Mrs. Merrill had lost her case and that the legislature had no right under the constitution to give her a chance to try it again.

In *Merrill v. Sherburne*, 1 N.H. 199 (1818), the court recognized that all cases submitted for its examination must be decided in accordance with "the laws of the land" and that the constitution "must be regarded by the judges as a fundamental law." *Id.* at 201. The court then stated that, when through inadvertence or mistake the legislature has passed an unconstitutional act, "our right and duty so to pronounce it [is] . . . unquestionable." *Id.* at 202.

"'Nor does this conclusion by any means suppose a superi-

ority of the judicial to the legislative power. It only supposes, that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decision by the fundamental laws, rather than by those, which are not fundamental.'"

*Id.* at 201–02. The court continued:

"But the judiciary would in every respect cease to be a check on the legislature, if the legislature could at pleasure revise or alter any of the judgments of the judiciary. The legislature too would thus become the court of last resort, 'the superior court,' or 'supreme judicial' tribunal of the state . . . ."

*Id.* at 210. The legislative grant of a new trial, a judicial act, was therefore "repugnant or contrary to the constitution" and thus void.

III. *Control of the Courtroom*

The *Merrill* court, referring to the vesting of judicial power in the courts (now in N.H. CONST. pt. II, art. 72-a), properly observed that "[n]o particular definition of judicial powers is given in the constitution; and considering the general nature of the instrument, none was to be expected." 1 N.H. at 203.

Over the years, it has become clear that the judiciary is in charge of the courtroom. The power to punish for contempts committed in the presence of the court or directly obstructing the court is not set forth in any New Hampshire statute. It is not a power granted by the legislature, but it is a necessary incident to the exercise of judicial power inherent in the functioning of the court system. *Kersevich v. Jaffrey Dist. Ct.*, 114 N.H. 790, 791, 330 A.2d 446, 447 (1974); *State v. Moquin*, 105 N.H. 9, 11, 191 A.2d 541, 543 (1963); *Bates' Case*, 55 N.H. 325, 326 (1875); *State v. Matthews*, 37 N.H. 450, 453 (1859); *Tenney's Case*, 23 N.H. 162, 166 (1851).

When the legislature in 1933 proposed legislation that would have drastically curbed the power to punish for contempt, the justices of this court advised that such legislation would violate the principle of separation of powers. *Opinion of the Justices*, 86 N.H. 597, 601–02, 166 A. 640, 646 (1933).

The power of the judiciary to control its own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court is a power absolutely necessary for

a court to function effectively and do its job of administering justice. As one amicus brief well stated:

> "A judge of a court of general jurisdiction (such as the Superior Court) has inherent power to control and order every aspect of any judicial proceeding before him, involving control of the courtroom and all that takes place in it. This inherent power to control the proceedings is a necessary attribute of judicial power in order that the presiding judge may function effectively as a judge. This power is exclusive and indivisible. During a trial there can only be one 'boss', the presiding justice; otherwise there would be disorder."

Brief of Richard Upton at 13–14. *See, e.g., In re Petition of Dover Police Dep't*, 115 N.H. 378, 378–79, 341 A.2d 760, 761 (1975) (the power to control the use of closed circuit television cameras and audio equipment within the courthouse); *Kersevich v. Jaffrey Dist. Ct.*, 114 N.H. 790, 791, 330 A.2d 446, 447–48 (1974) (the power to control the dress or attire of participants in the trial); *Benton v. Dover Dist. Ct.*, 111 N.H. 64, 65, 274 A.2d 876, 878 (1971) (the power to keep order and punish disorderly conduct).

██ ██ The courts' authority to adopt rules of practice and procedure is of ancient origin. Its history is well summarized in *Nassif Realty Corp. v. National Fire Ins. Co.*, 107 N.H. 267, 220 A.2d 748 (1966) and *Garabedian v. William Company*, 106 N.H. 156, 207 A.2d 425 (1965). The court's conclusion in these cases is that the rule-making process is an inherent judicial power existing independently of legislative authority. In addition, part II, article 73-a of the New Hampshire Constitution, which granted to the supreme court the power to make rules regulating the administration of all courts of the State, makes clear that the judiciary has the authority to promulgate and administer rules concerning practice and procedure in the courtroom.

In 1974, the question came before us "whether the wearing of a side-arm by a police officer in uniform while prosecuting a misdemeanor case in the district court denies defendant equal protection or due process of law or otherwise prevents a fair trial." *State v. Whippie*, 114 N.H. 369, 322 A.2d 917 (1974). The State then agreed to "the jurisdiction of this Court over matters of practice and procedure in the . . . Courts. . . ." Brief of State at 9.

The court agreed and said:

> "In his courtroom, the judge, as the representative of the law and of the judicial branch of our government, is the

controlling authority. . . . Absent special authority from the presiding justice in extraordinary situations no one, other than duly authorized bailiffs, should be armed while appearing in court. RSA 490:4 (Supp. 1973)."

*State v. Whippie*, 114 N.H. at 370, 322 A.2d at 917–18. It was after that opinion that the legislature in 1975 enacted RSA 490:4-a.

The statement of the court in the early case of *Deming v. Foster*, 42 N.H. 165, 178 (1860), that court rules are subordinate to an act of the legislature "passed in the due exercise of its constitutional powers," relied on by the State, really begs the question. Whether this legislation was "passed in the due exercise of its constitutional powers" is what the present case is all about.

 It would not be within the constitutional prerogative of the judiciary to tell either of the other two branches of government who could or could not wear guns in the Executive Council Chamber or in the Representatives' Hall. That would properly be a matter for those branches of government to resolve, as the House of Representatives has done in the following rule:

> "No person, including members of the House, except law enforcement officers while actively engaged in carrying out their duties *as such*, shall carry or have in his possession any firearm while he is in the House Chamber anterooms, cloakrooms, or any portion of the State House adjacent to any of the above. Any person in violation of this rule shall be subject to ejection from any such premises on the order of the Speaker and disciplinary action and arrest or both by action of the House."

*Manual for the Use of the General Court*, Rule 15, at 99 (1983) (emphasis added).

 The separation of powers doctrine set forth in New Hampshire Constitution part I, article 37 compels limits to encroachments by one branch into the inherent and internal affairs of another branch. Thus, when a newspaper attempted to have a judge compel the Clerk of the House of Representatives to turn over, under the right-to-know law (RSA ch. 91-A), a tape of a house proceeding for use in a "voice stress analysis," we faced a separation of powers confrontation. The Speaker of the House took the matter to the floor, and the unwritten "policy" against removal of the tapes from the clerk's office was affirmed by that body. When the matter was brought to us we said in part

> "The house of representatives, as a separate and coequal branch of government, is constitutionally authorized to

promulgate its own rules. . . . The house could properly decide, consistent with the right of reasonable public access required by N.H. CONST. pt. I, art. 8, that its official tape should not be duplicated or subjected to a so-called voice stress analysis."

*Union Leader Corp. v. Chandler*, 119 N.H. 442, 445, 402 A.2d 914, 915 (1979) (citations omitted).

 Likewise, we have recognized that separation of powers requires that we defer to the State Senate in its decisions concerning whom to seat in cases of election contests or disputes. N.H. CONST. pt. II, art. 35. As we noted in the seating dispute of 1965 in the aftermath of the 1964 elections:

"It has been the established law in this state from the beginning that it is not the function of the judicial branch of the government to pass upon the wisdom, desirability and expediency of statutes enacted by the Legislature. So too, this court has not been invested with the power to pass upon the wisdom of the legislative branch of the government in determining the qualifications of its members. Hence we have no authority to approve or disapprove the action thus taken by the Senate. For this court to interfere would be a usurpation of the authority of the Senate granted to it by the Constitution."

*Brown v. Lamprey*, 106 N.H. 121, 124, 206 A.2d 493, 495 (1965) (citations omitted). *See also Seabrook Citizens v. Yankee Greyhound Racing, Inc.*, 123 N.H. 103, 109–10, 456 A.2d 973, 977 (1983) (the remedy for enactment of important legislation by "footnote" is at "the ballot box, not in the courts.")

IV. *Conclusion*

 For the reasons stated above, we answer "no" to the first transferred question. RSA 490:4-a violates the separation of powers doctrine provided by pt. I, art. 37 of the Constitution of New Hampshire. The second question, about a trial judge's inherent authority to control the wearing of firearms in the courtroom, was predicated on the existence of the statute. Nonetheless, for the same reasons that we have set out above, it is clear that trial judges, subject to our review, have authority under the judicial power of the constitution to control the wearing of firearms in the courtroom.

The third question seeks a determination whether the wearing of arms by a police officer when testifying against a defendant in a

criminal trial infringes upon the defendant's right to a fair trial, guaranteed by pt. I, art. 15 of the State Constitution and by the Fourteenth Amendment of the Constitution of the United States. *State v. Whippie*, 114 N.H. 369, 322 A.2d 917 (1974), held that there was no such violation when the officer in question was prosecuting in a district court without a jury. The third question here seeks a determination on the assumption that the officer is a witness, but not a prosecutor, in courts generally. In the superior court, of course, such a witness will often testify before a jury.

On the record before us, we are not prepared at this time to give a general answer to this constitutional question. We do not conclude on the present record that the wearing of sidearms can never result in a denial of due process, but neither do we conclude that such will generally or under any particular circumstances be the case.

Although we do not have occasion at this time to decide the constitutional question posed, we will act in our supervisory rule-making capacity to address two issues that have been raised in the course of arguments and our deliberation on this case: the desirability of a uniform standard in the trial courts of the State governing the wearing of sidearms by police witnesses, and the need for standards of courtroom security.

In the meantime, trial judges may, in the sound exercise of their discretion, determine when and where police may wear guns while appearing in our courts, keeping uppermost in mind the requirements of procedural due process and the need to provide security for courtrooms and weapons.

*Remanded.*

BATCHELDER, J., did not sit; FLYNN, J., sat by special assignment pursuant to RSA 490:3.